T.C. Memo. 2013-48

UNITED STATES TAX COURT

JORGE PANEQUE AND LEOBIGILDA PANEQUE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JORGE PANEQUE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 15871-08, 16193-08.[1]          Filed February 13, 2013.

<u>William Z. Shulman</u>, for petitioners.

<u>Erik M. Sternberg</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Jorge and Leobigilda Paneque (hereinafter, petitioners,

collectively, and Mr. or Mrs. Paneque, individually) invoked the Court's

_____

[1]These cases were consolidated for purposes of trial, briefing, and opinion.

**[\*2]** jurisdiction pursuant to section 6404(e)[2] to review respondent's final determinations (1) denying Mr. Paneque's request for abatement of interest accruing on unpaid Federal employment taxes, and (2) denying petitioners' joint request for abatement of interest accruing on unpaid Federal income tax. Petitioners contend that respondent abused his discretion in denying their requests for abatement of interest for the period October 21, 2005, through August 3, 2007.

FINDINGS OF FACT

Some facts are stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference. At the time the petitions were filed, petitioners resided in New Jersey.

During the periods at issue and thereafter Mr. Paneque was an accountant who prepared Federal tax returns in the regular course of his business. Also during these periods Mr. Paneque was the sole shareholder of JBDG Accounting Service, Inc. (JBDG Accounting), and JLP Associates, Inc.

Mr. Paneque concedes he is personally liable for Federal employment taxes that JBDG Accounting and JLP Associates, Inc., reported but failed to pay for the quarters ended March 31, 2000, to September 30, 2001, December 31, 2002, June

---

[2]Unless otherwise indicated, section references are to the Internal Revenue Code of 1986, as in effect for the years at issue.

[*3] 30, 2003, and September 30, 2003 (employment tax liabilities). Petitioners concede they are jointly and severally liable for income tax that they reported but failed to pay on their Federal income tax returns for 1994, 1995, 1996, 1997, 1998, 1999, 2000, and 2002 (income tax liabilities). By the fall of 2005 petitioners' income tax liabilities and Mr. Paneque's employment tax liabilities for the aforementioned periods totaled approximately $400,000.

Petitioners engaged in the practice of submitting multiple, serial offers-in-compromise (OIC). In the view of at least some Internal Revenue Service (IRS) personnel, these offers were frivolous, designed to thwart collection. From February through December 2004, petitioners, either jointly or separately, submitted to the IRS at least five Forms 656, Offer in Compromise, based on doubt as to collectibility. Petitioners jointly submitted an OIC of $60,000 on February 20, 2004, to settle their outstanding joint income tax liabilities. That OIC was returned to them on August 30, 2004, on the grounds that Mr. Paneque was not current with respect to his employment tax obligations for the third quarter of 2004. On December 3, 2004, petitioners jointly submitted an OIC of $80,000 to settle their joint income tax liabilities and Mr. Paneque submitted an

[*4] OIC of $20,000 to settle his employment tax liabilities.[3] Then on December 31, 2004, Mr. Paneque submitted an OIC of $90,000 to settle his joint income tax liabilities and his employment tax liabilities, while Mrs. Paneque submitted an OIC of $10,000 to settle her joint income tax liabilities. Both offers were rejected by the IRS in May 2005.[4] A fifth OIC, submitted on behalf of JBDG Accounting at a time not disclosed in the record, was rejected on September 29, 2005, because the corporation had failed to file an income tax return for 2004.

The OIC at issue in these cases was submitted by an attorney, Marc D. Marsico (Mr. Marsico), on behalf of Mr. Paneque on September 22, 2005. This OIC proposed to settle all of Mr. Paneque's aforementioned joint income tax liabilities and employment tax liabilities[5] for $30,000. Mr. Marsico's cover letter

---

[3]Mr. Paneque's $20,000 OIC to settle his employment tax liabilities was rejected on September 9, 2005, on the ground of his failure to file employment tax returns for 2004. The record does not disclose the disposition of the OIC concerning petitioners' joint income tax liabilities.

[4]By letter dated June 17, 2005, petitioners' attorney requested Appeals Office reconsideration of the rejection of Mrs. Paneque's December 31, 2004, OIC, but there is no record of the disposition of that request or of what further action, if any, was taken with respect to the rejection of Mr. Paneque's OIC of that date.

[5]The OIC recited that it covered employer's quarterly Federal tax returns for the taxable periods ending March 31, 1996, through June 30, 1998, and trust fund recovery penalties for the taxable periods ending March 31, 2000, through December 31, 2001.

[*5] transmitting Mr. Paneque's OIC indicated that Forms 433-A, Collection Information Statement for Wage Earners and Self Employed Individuals, and 433-B, Collection Information Statement for Businesses, accompanied the offer. These forms are not in the record, however.

On October 21, 2005, Mr. Paneque's OIC was assigned to IRS Offer Specialist Linda Washington (Ms. Washington).[6] On November 29, 2005, Ms. Washington concluded on the basis of her review of Mr. Paneque's Forms 433-A and 433-B that his "reasonable collection potential" (RCP)[7] far exceeded his $30,000 offer. Consequently, Ms. Washington determined that Mr. Paneque's OIC should be rejected, and she saw no reason at that time to review additional background documents to verify the information contained in the Forms 433-A and 433-B.

On December 13, 2005, Ms. Washington spoke with Mr. Marsico by telephone and informed him that (1) Mr. Paneque's RCP exceeded the amount of his $30,000 offer, and (2) it did not appear that Mr. Paneque had paid income tax

---

[6]Mr. Paneque's OIC initially was mailed to the wrong IRS office, and there was a delay of two weeks in transmitting the offer documents to Ms. Washington.

[7]"Reasonable collection potential" is defined as the amount that could be collected from a taxpayer from all available means. Internal Revenue Manual pt. 5.8.4.3 (June 1, 2010).

[*6] that he owed for taxable year 2004,[8] made estimated income tax payments for 2005, or made employment tax payments for 2005.  During this conversation Ms. Washington noted that Mr. Paneque was seeking to compromise joint Federal income tax liabilities and inquired why the OIC was not joint.  Mr. Marsico informed her that Mrs. Paneque had previously submitted a separate OIC that was under review in the IRS Appeals Office.[9]  Mr. Marsico requested additional time to confer with Mr. Paneque regarding the compliance issues that Ms. Washington had raised.

On February 7, 2006, Mr. Marsico filed with the Taxpayer Advocate's Office a Form 911, Application for Taxpayer Assistance Order.  Notwithstanding Mr. Marsico's earlier communications with Ms. Washington in December 2005, the application stated that Mr. Marsico had made several phone calls to the IRS regarding Mr. Paneque's OIC but had received no response.

On February 10, 2006, Ms. Washington sent a letter to Mr. Marsico and Mr. Paneque stating that she had determined Mr. Paneque's RCP to be $373,952 and

---

[8]On December 15, 2005, Mr. Paneque sent a check to Ms. Washington for $410 to eliminate the balance due on his income tax account for 2004.

[9]On the record presented, the Court assumes Mr. Marsico was referring to Mrs. Paneque's OIC of December 31, 2004, initially rejected in May 2005 and appealed by him in June 2005.  See supra note 4.

**[*7]** that therefore she could not recommend acceptance of his OIC of $30,000. The letter enclosed worksheets showing the RCP calculation and advised that the OIC should be increased or withdrawn by February 24, 2006, or it would be rejected.

By letter dated February 20, 2006, Mr. Marsico challenged several of the assumptions underlying Ms. Washington's computation of Mr. Paneque's RCP but nonetheless indicated that Mr. Paneque was increasing the amount of his offer to $275,000.

On March 23, 2006, Mr. Marsico called Ms. Washington to inquire about the status of Mr. Paneque's revised OIC. Ms. Washington informed Mr. Marsico that she had received the revised OIC but had been placed on a special assignment and she would have to call back later to discuss the matter.

Sometime after March 23, Ms. Washington made revisions to her computation of Mr. Paneque's RCP, which increased it by approximately $3,000. In a letter to Mr. Paneque dated April 14, 2006, Ms. Washington stated in relevant part: "I have enclosed the revised worksheets for your review. As you can see the reasonable collection potential amounts to $376,976.00. If you can increase your offer to a minimum of $376,976.00 I can consideration [sic] an acceptance

[*8] recommendation." Ms. Washington indicated that Mr. Paneque should increase his OIC to the amount specified by means of an amended Form 656.

On May 1, 2006, Mr. Paneque submitted to Ms. Washington an amended OIC of $376,976.[10] On May 4, 2006, Ms. Washington called Mr. Marsico and sent him a letter requesting additional financial information in support of Mr. Paneque's amended offer, including Mr. Paneque's bank records for the period January through April 2006. On May 9, 2006, Mr. Marsico sent a letter to Ms. Washington stating that the financial information she requested had been provided to the Centralized Offer in Compromise Unit in January 2006,[11] that Mr. Paneque was not inclined to compile the records again, and that Ms. Washington should either accept Mr. Paneque's amended OIC or reject it so that the matter could be appealed. In response, Ms. Washington advised Mr. Marsico that if the requested information was not received by May 23, the OIC would be returned.

---

[10]Mr. Paneque submitted a Form 656 along with his amended offer, but that form is not part of the record.

[11]The financial information that Mr. Paneque purportedly submitted to the Centralized Offer In Compromise Unit in January 2006 is not in the record. In any event, it is clear that Mr. Paneque's bank statements for January through April 2006 had not been provided to the IRS at the time Ms. Washington requested the additional information.

[*9] During the spring of 2006 the IRS National Office decided to disband the OIC unit in New Jersey where Ms. Washington worked and reassign OIC review work to an IRS office in Nashville, Tennessee. As part of this restructuring, Ms. Washington was scheduled to be reassigned from her position as an OIC specialist to that of a revenue officer. On May 9, 2006, Ms. Washington informed Mr. Marsico that Mr. Paneque's OIC would be reassigned to another IRS employee on or about May 26, 2006.

On May 16, 2006, despite his earlier protestations, Mr. Paneque provided Ms. Washington with the additional financial information she had requested. Ms. Washington's last substantive entry in her case activity records regarding Mr. Paneque's OIC is dated May 26, 2006, and indicates that she had found discrepancies between Mr. Paneque's financial disclosures underlying his OIC and his bank statements for 2006 that required further investigation. In addition, Ms. Washington noted that Mr. Paneque's recent disclosures revealed that he had acquired an interest in real property in Union City, New Jersey, that had not been listed on the Forms 433 previously submitted and required further investigation.

Mr. Marsico's case notes indicate that he telephoned Ms. Washington on June 8, 2006, to inquire concerning the status of Mr. Paneque's OIC. A corresponding entry in Ms. Washington's case activity records indicates that she

**[*10]** received a voicemail from Mr. Marsico inquiring about status on June 9, 2006, and left a message for him that same day advising that the case has been reassigned.[12]

On June 12, 2006, Mr. Marsico asked Ms. Washington for the total amount due from petitioners. She advised him by phone that same day that the total amount of petitioners' outstanding tax liabilities on that date was $424,432.77. On June 13, 2006, Mr. Marsico left a message for Ms. Washington requesting a so-called payoff letter.[13] Mr. Marsico's case notes indicate that he received a payoff letter on June 15, 2006.

On June 27, 2006, Mr. Paneque contacted Mr. Marsico and requested that he obtain a payoff letter reflecting the total amount due from petitioners through July 7, 2006. Mr. Marsico attempted to contact Ms. Washington by telephone on June 27, 2006, and July 11, 2006, but he received no reply. On July 11, 2006, Mr. Paneque informed Mr. Marsico that he could not afford to pay his tax liabilities in full. On July 13, 2006, Mr. Marsico sent a letter to Ms. Washington asking that

---

[12]There is no evidence in the record that Ms. Washington advised Mr. Marsico or Mr. Paneque at this time or subsequently of the identity of a new contact person at the IRS.

[13]A "payoff letter" is issued to taxpayers who request the current amount that must be paid to secure the release of a Federal tax lien. See IRS Publ'n 1468, at 5 (rev. Aug. 2006).

**[\*11]** Mr. Paneque's OIC be rejected so that he could seek review in the Office of Appeals.

On September 5, 2006, Mr. Marsico received formal notification by letter that Mr. Paneque's OIC had been transferred to Nashville for review.[14] Insofar as the record discloses, this letter was the first notification of a new contact person at the IRS for inquiries concerning Mr. Paneque's OIC. After attempting unsuccessfully to reach by telephone the IRS Nashville employee listed as the contact person, Mr. Marsico responded by letter dated September 19, 2006, requesting that the Nashville office reject Mr. Paneque's OIC so that consideration by the Office of Appeals could begin.[15] The OIC was assigned to a new offer specialist, Ms. Fiske,[16] on September 29, 2006.

On October 2, 2006, Ms. Fiske discussed the OIC with Mr. Marsico, and on October 4 she advised him by letter that she would recommend that the OIC be

_____

[14]Although the notification letter is dated August 17, 2006, respondent does not dispute petitioners' requested finding that Mr. Marsico received it on September 5, 2006.

[15]Mr. Marsico also stated that he had been advised by Ms. Washington, after a full investigation, that she would reject Mr. Paneque's offer with appeal rights. The administrative record, however, indicates that at the time her assignment to petitioner's case terminated, she had concluded that because of discrepancies in Mr. Paneque's financial disclosure, his OIC warranted further investigation before acceptance or rejection.

[16]Ms. Fiske was assigned to an IRS unit in Santa Ana, California.

**[*12]** rejected on the ground that Mr. Paneque was able to fully pay his outstanding tax liabilities without suffering economic hardship. She enclosed tables showing her computations of Mr. Paneque's RCP.

On October 26, 2006, Mr. Paneque informed Mr. Marsico that he was willing to pay his tax liabilities in full.

Ms. Fiske informed Mr. Marsico that her recommendation to reject Mr. Paneque's OIC was subject to review first by her group manager and then by an independent administrative reviewer. On December 7, 2006, Ms. Fiske's group manager agreed with Ms. Fiske's recommendation to reject Mr. Paneque's OIC and the matter was forwarded to an independent administrative reviewer.

On January 4, 2007, Mr. Marsico left a message for Ms. Fiske requesting a payoff letter. Mr. Marsico was informed that Ms. Fiske would be out of the office until January 23, 2007. On January 6, 2007, Mr. Marsico filed a request for assistance with the Taxpayer Advocate's Office, requesting that Mr. Paneque be issued a rejection letter with respect to his OIC so that he could appeal.

On January 23, 2007, Ms. Fiske received a voicemail message from Mr. Marsico requesting the amount needed to fully pay petitioners' tax liabilities. Ms. Fiske in turn left a message for Mr. Marsico indicating that she had requested transcripts that would reflect petitioners' payoff amounts and he should expect the

**[*13]** transcripts on or before February 5, 2007. Ms. Fiske spoke with Mr. Marsico by telephone on January 24, 2007, and discussed the account transcripts. Mr. Marsico provided Ms. Fiske with the identity of a lender in need of a copy of petitioners' payoff letter, and she advised him of a telephone number to which a third-party lender request for payoff information could be faxed.

On February 12, 2007, the independent administrative reviewer sustained Ms. Fiske's proposed rejection of Mr. Paneque's OIC. On March 5, 2007, Mr. Marsico received a copy of the OIC rejection letter.

On February 16, 2007, Mr. Paneque visited an IRS field office where he attempted unsuccessfully to obtain a payoff letter. Mr. Marsico called Ms. Fiske and left a message seeking her assistance. On February 26, 2007, Mr. Marsico met with Mr. Paneque to discuss a fax from the IRS that included payoff information. Mr. Marsico's case notes indicate that Mr. Paneque intended to determine whether his lender would accept the information.

During the same period that Mr. Marsico was conferring with Ms. Washington and then Ms. Fiske concerning Mr. Paneque's OIC, Mr. Paneque was in regular contact with Revenue Officer Maritza Matthews (RO Matthews) concerning his failure to satisfy the employment tax obligations of JBDG

[*14] Accounting (of which he was the sole shareholder).[17] In late June or early July 2006 RO Matthews had contacted Mr. Paneque because he had defaulted on an installment agreement covering those employment tax liabilities. At that time, Mr. Paneque advised her that collection efforts should be suspended because he had an OIC under consideration.

On March 2, 2007, RO Matthews contacted Mr. Paneque to discuss his failure to make required installment payments of employment taxes. Her case activity records state that Mr. Paneque complained then that he had requested a payoff letter but that it had taken the IRS 10 months to comply.[18]

During a May 15, 2007, meeting with RO Matthews, Mr. Paneque requested a payoff figure that would be effective through May 31, 2007, for the employment tax liabilities arising from the operations of JBDG Accounting, indicating that he

---

[17]RO Matthews had been assigned responsibility to collect the unpaid employment taxes of JBDG Accounting as early as August 2003.

[18]The earliest request for a payoff letter established in the record is Mr. Marsico's request on June 13, 2006, which was satisfied on June 15, 2006-- approximately 8-1/2 months before Mr. Paneque's complaint to RO Matthews. Mr. Marsico attempted (unsuccessfully) to obtain another payoff letter (at Mr. Paneque's request) from Ms. Washington after she was no longer assigned to Mr. Paneque's OIC, in late June and early July 2006, or approximately 9 months before Mr. Paneque's complaint. Thereafter, Mr. Marsico had asked for and received payoff information on two occasions in January and February 2007, as more fully described above.

[*15] planned to make a full payment of all of his outstanding tax liabilities. RO Matthews visited Mr. Paneque's business on June 6, only to find him away on vacation. On June 11 Mr. Paneque called RO Matthews to advise that he hoped to close on a bank loan later in the week so that he could pay his outstanding tax liabilities. RO Matthews advised that she intended to levy on his assets if the employment tax liabilities were not paid by July 6, 2007. RO Matthews' case activity records do not indicate that Mr. Paneque asked for a payoff amount or letter at this time, and there is no other evidence that he did. Not having heard from Mr. Paneque, RO Matthews called him on July 17 seeking payment of the employment tax liabilities. Mr. Paneque then asked her for a payoff amount, and she advised him that the full pay amount for the employment tax liabilities would be $93,456.01 as of July 26, 2007.

On or about August 10, 2007, petitioners paid $491,132 in full satisfaction of their outstanding income tax liabilities and employment tax liabilities. The record does not reflect whether petitioners used cash on hand or borrowed funds to pay these liabilities.

**[*16]** Petitioners subsequently submitted to respondent requests for abatement of interest.[19] Respondent denied petitioners' requests, and petitioners filed timely petitions for review.

OPINION

I.    Abatements of Interest--Section 6404

Interest normally begins to accrue on a Federal tax liability from the last date prescribed for payment of such tax and continues to accrue, compounding daily, until payment is made.  See secs. 6601(a), 6622.  Because interest continues to accrue until paid, interest may be assessed at any time during the period within which the tax to which such interest relates may be collected.  Sec. 6601(g).

Congress has authorized the Secretary to abate an assessment of interest in limited circumstances.  Section 6404(e)(1) provides that, in the case of any assessment of interest on (1) any deficiency attributable in whole or in part to any unreasonable error or delay by an officer or employee of the IRS, acting in an official capacity, in performing a ministerial or managerial act, or (2) any payment of any tax described in section 6212(a) to the extent that any delay in such payment is attributable to such officer or employee being erroneous or dilatory in

---

[19]Copies of petitioners' requests for abatement of interest are not in the record.

[*17] performing a ministerial or managerial act, the Secretary may abate the assessment of all or any part of such interest for any period.[20]  For purposes of section 6404(e)(1), an error or delay may be taken into account only if no significant aspect of such error or delay can be attributed to the taxpayer involved and after the IRS has contacted the taxpayer in writing with respect to such deficiency or payment.

When the Secretary issues a notice of determination denying a taxpayer's request for abatement of interest under section 6404 and the taxpayer files a timely petition for review, section 6404(h) vests the Court with jurisdiction to determine whether the Secretary's failure to abate interest was an abuse of discretion, and if so, to order an abatement.[21]

---

[20]Sec. 6404(e)(1) applies to interest accruing with respect to deficiencies or payments for taxable years beginning after December 31, 1978.  Tax Reform Act of 1986, Pub. L. No. 99-514, sec. 1563(b), 100 Stat. at 2762.  In 1996 Congress amended sec. 6404(e)(1)(A) and (B) to refer to "unreasonable" errors or delays in performing "ministerial and managerial" acts.  Taxpayer Bill of Rights 2, Pub. L. No. 104-168, sec. 301(a), 110 Stat. at 1457.  The amendments apply to interest accruing on deficiencies or payments for taxable years beginning after July 30, 1996.  See id. sec. 301(c).  For taxable years beginning on or before July 30, 1996, the Secretary may abate an assessment of interest under sec. 6404(e)(1) only when it is attributable to an error or delay by an IRS officer or employee in performing a "ministerial" act.  See id.

[21]Sec. 6404(h)(1) provides that the taxpayer must meet the net worth requirements referred to in sec. 7430(c)(4)(A)(ii).  Both petitions include allegations

(continued...)

[*18] The Court has often observed that Congress did not intend for the Secretary to routinely exercise his authority to abate interest under section 6404(e) and that interest abatement should be granted only "'where failure to abate interest would be widely perceived as grossly unfair'". See, e.g., Krugman v. Commissioner, 112 T.C. 230, 238-239 (1999) (quoting H.R. Rept. No. 99-426, at 844 (1985), 1986-3 C.B. (Vol. 2) 1, 844; S. Rept. No. 99-313, at 208 (1986), 1986-3 C.B. (Vol. 3) 1, 208).

To prevail under section 6404(e), the taxpayer must: (1) identify an error or delay by the IRS in performing a ministerial or managerial act; (2) establish a correlation between the error or delay by the IRS and a specific period for which interest should be abated; and (3) show that he or she would have paid the tax liability earlier but for such error or delay. See Hancock v. Commissioner, T.C. Memo. 2012-31; Braun v. Commissioner, T.C. Memo. 2005-221. If these factors are present, the taxpayer also must show that, in denying the taxpayer's interest abatement request, the Secretary abused his discretion (i.e., acted arbitrarily,

---

[21](...continued)
that petitioners meet the requirements of sec. 7430(c)(4)(A)(ii). Respondent's answers state that these allegations constitute legal conclusions to which no response is required and, to the extent a response is required, respondent denies for lack of knowledge or information. Respondent has not otherwise contested this matter, and the Court concludes that petitioners satisfy the net worth test and have properly invoked the Court's jurisdiction.

[*19] capriciously, or without sound basis in fact or law).  Sec. 6404(h)(1); see

Allcorn v. Commissioner, 139 T.C. ___, ___ (slip op. at 8) (Aug. 9, 2012); Woodral

v. Commissioner, 112 T.C. 19, 23 (1999).

A managerial act "means an administrative act that occurs during the

processing of a taxpayer's case involving the temporary or permanent loss of

records or the exercise of judgment or discretion relating to management of

personnel."  Sec. 301.6404-2(b)(1), Proced. & Admin. Regs.[22]  However, a "general

administrative decision", such as the IRS' decision on how to organize the

processing of tax returns, is not a managerial act for which interest can be abated

under section 6404(e).  Id.; see also sec. 301.6404-2(c), Examples (7) and (8),

Proced. & Admin. Regs.

A ministerial act "means a procedural or mechanical act that does not

involve the exercise of judgment or discretion, and that occurs during the

processing of a taxpayer's case after all prerequisites to the act, such as

---

[22]Sec. 301.6404-2, Proced. & Admin. Regs., generally is applicable to interest accruing with respect to deficiencies or payments of any tax described in sec. 6212(a) for taxable years beginning after July 30, 1996.  The definition of a "ministerial" act for taxable years beginning before August 1, 1996, is the same as that set forth in the text.  See sec. 301.6404-2T(b)(1), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 30163 (Aug. 13, 1987).

**[*20]** conferences and review by supervisors, have taken place." Sec. 301.6404-2(b)(2), Proced. & Admin. Regs.

II.     Offers-in-Compromise

Section 7122(a) permits the Secretary to compromise any civil case arising under the internal revenue laws.  Section 7122(d)(1) provides that the Secretary shall prescribe guidelines for IRS officers and employees to determine whether an OIC is adequate and should be accepted to resolve a dispute.  See sec. 301.7122-1, Proced. & Admin. Regs.; Rev. Proc. 2003-71, 2003-2 C.B. 517.  An OIC based on doubt as to collectibility generally will be considered acceptable "if it is unlikely that the tax can be collected in full and the offer reasonably reflects the amount the Service could collect [also referred to as reasonable collection potential] through other means, including administrative and judicial collection remedies."  Rev. Proc. 2003-71, sec. 4.02, 2003-2 C.B. at 517; see sec. 301.7122-1(b)(2), Proced. & Admin. Regs.  The authority to reject an OIC generally has been delegated within the Collection Division to numerous supervisory positions including the division chief, branch chiefs, field branch chiefs, and group managers.  Delegation Order No. 11 (Rev. 24), 59 Fed. Reg. 37130-37131 (July 20, 1994).  While division chiefs and branch chiefs may accept an OIC regardless of the amount of the underlying liability, field branch chiefs and group managers (the latter acting

**[\*21]** pursuant to a redelegation of authority) may accept an OIC if the amount of the liability is less than $100,000.  Id.

III.  Abatement--Employment Tax

Mr. Paneque contends that respondent abused his discretion in disallowing his request for abatement of the interest that accrued on his unpaid employment tax liabilities during the period October 21, 2005, through August 3, 2007.  Respondent contends that assessments of interest on employment tax liabilities are not eligible for abatement under section 6404(e)(1).  We agree.

Respondent lacked authority to abate interest under section 6404(e), and his failure to do so could not constitute an abuse of discretion.  See Woodral v. Commissioner, 112 T.C. at 25; see also Scanlon White, Inc. v. Commissioner, 472 F.3d 1173, 1177 (10th Cir. 2006), aff'g T.C. Memo. 2005-282; Miller v. Commissioner, 310 F.3d 640, 645 (9th Cir. 2002), aff'g T.C. Memo. 2000-196.[23]

IV.  Abatement--Income Tax

Petitioners contend that respondent abused his discretion in disallowing their joint request for abatement of the interest that accrued on their unpaid income

[23]Mr. Paneque has not contended that interest on the employment tax liabilities in question should have been abated pursuant to sec. 6404(a), which authorizes the Secretary to abate the unpaid portion of any assessment of any tax or any liability that is excessive in amount, is not timely assessed, or is erroneously or illegally assessed.

[*22] tax liabilities during the period October 21, 2005, through August 3, 2007. Petitioners assert that they experienced unreasonable delays in the processing of Mr. Paneque's OIC and in his obtaining a payoff letter from the IRS that he needed to secure a bank loan to pay their income tax liabilities.

A. Petitioners' First Contention

Petitioners contend that Ms. Washington caused an unreasonable delay in the disposition of Mr. Paneque's OIC because she failed to engage in any substantive communications with Mr. Marsico between October 21, 2005, when the OIC was assigned to her, and February 10, 2006, when she sent a letter to Mr. Marsico and Mr. Paneque explaining that Mr. Paneque's RCP of $373,952 far exceeded the amount of his OIC. Petitioners also allege that Ms. Washington caused an unreasonable delay by failing to obtain the financial records substantiating the entries on Mr. Paneque's Form 433-A and Form 433-B until early May 2006 when Mr. Paneque increased the offer amount to match what she had determined to be his RCP of $376,976. Finally, petitioners assert that in April 2006 Ms. Washington inappropriately led them to believe that she would recommend that Mr. Paneque's OIC be accepted.

We are not persuaded that Ms. Washington committed an error or was dilatory in performing a ministerial or managerial act such that an abatement of

[*23] interest would be justified. Although Ms. Washington was deliberate in the processing of Mr. Paneque's OIC, the chronology of events indicates that she was engaged in a diligent and good-faith effort to properly evaluate Mr. Paneque's OIC and negotiate an appropriate compromise agreement with him.

Contrary to petitioners' assertion that the first substantive communication from Ms. Washington was her letter of February 10, 2006, she advised Mr. Marsico by telephone on December 13, 2005, that Mr. Paneque's RCP far exceeded the amount of his $30,000 OIC and that he was in any event not in compliance with respect to his income tax obligations for 2004 and 2005 and his employment tax obligations for 2005.[24] Ms. Washington took approximately seven weeks to complete her analysis and communicate to Mr. Paneque (in her February 10, 2006, letter), that his RCP was $373,952--well in excess of his $30,000 offer. Given the circumstances, including the fact that Mr. Paneque had submitted a separate OIC for his joint income tax liabilities with Mrs. Paneque (which required additional computations such as his proportionate share of the couple's household expenses), we are not persuaded that there was any unreasonable delay in the processing of Mr. Paneque's OIC between October 21,

---

[24]That Ms. Washington raised compliance issues at this time is corroborated by Mr. Paneque's submission of a check to her two days later on December 15, 2005, to satisfy his 2004 income tax liability.

**[\*24]** 2005, and February 10, 2006. Shortly thereafter, Mr. Marsico challenged Ms. Washington's computations in several respects but indicated that Mr. Paneque would increase the amount of his offer to $275,000. Two months later, in April 2006, Ms. Washington advised that her revised computations, taking into account Mr. Marsico's challenges, actually resulted in a slight increase in Mr. Paneque's RCP to $376,976. She further advised that she was prepared to recommend acceptance of an OIC in that amount. On May 1, 2006, Mr. Paneque submitted to Ms. Washington a revised OIC of $376,976.

In sum, over a span of seven months, Mr. Paneque increased the amount of his offer more than tenfold, which suggests that his initial offer was frivolously low. We find no fault with Ms. Washington's careful evaluation of what was an evolving and complex OIC, submitted separately from that of a spouse with whom Mr. Paneque had filed joint returns and shared a household.

Petitioners also suggest that unreasonable delay occurred because Ms. Washington did not request updated financial records substantiating what was reported on Mr. Paneque's Form 433-A and Form 433-B until May 4, 2006--after she advised Mr. Paneque on April 14, 2006, that she would consider recommending acceptance of his OIC if he raised it to $376,976 and he did just that on May 1, 2006. Petitioners further contend that delay arose because Ms.

[*25] Washington's April 14 letter indicated that the OIC should be increased to $376,976 by means of an amended Form 656, which caused petitioners to reasonably believe, they contend, that their OIC in that amount would be recommended for acceptance without further analysis.

We see the circumstances differently. The consideration of Mr. Paneque's OIC consumed the first four months of 2006 because the amounts he offered before May 1, 2006, fell substantially short of what Ms. Washington had determined to be his RCP, a computation to which he ultimately acquiesced only after substantial challenges thereto.[25] Because Mr. Paneque persisted over four months in pressing acceptance of amounts that were clearly inadequate, his previously submitted financial substantiation became stale, and we cannot say Ms. Washington acted unreasonably in postponing her request for updated substantiation until Mr. Paneque indicated a willingness to revise his OIC to conform to the RCP she had computed.[26] Moreover, the fact that Ms. Washington

[25]We note that petitioners also do not now dispute Ms. Washington's computation of Mr. Paneque's RCP in this proceeding, and their payment of $491,132 in full satisfaction of their outstanding tax liabilities a little over one year later tends to support the accuracy of her computation.

[26]Petitioners had submitted at least five OIC's during 2004, four of which were rejected and the fifth of which was disposed of in a manner not disclosed in the record. Ms. Washington concluded that petitioners had a history of submitting

(continued...)

**[\*26]** then found significant discrepancies between the bank records covering the first part of 2006 and the information that had been reported on Mr. Paneque's Form 433-A and Form 433-B extinguishes any argument that petitioners had a reasonable expectation that Mr. Paneque's amended OIC would be promptly processed for acceptance in May 2006. We cannot say that Ms. Washington acted unreasonably in determining that the OIC required further investigation after she uncovered these discrepancies.

### B. Petitioners' Second Contention

Petitioners also assert that they experienced an unreasonable delay in the processing of Mr. Paneque's OIC after the IRS closed Ms. Washington's OIC unit in New Jersey and reassigned Mr. Paneque's OIC to an IRS unit in Nashville, Tennessee.

Ms. Washington's last substantive activity with regard to Mr. Paneque's OIC occurred in late May 2006 when she analyzed Mr. Paneque's bank statements for the first part of 2006 and found discrepancies with his previous disclosures.

---

[26](...continued)
frivolous OICs in an effort to thwart collection. We do not find her conclusion unreasonable in the circumstances. Given petitioners' OIC history, we likewise do not find it unreasonable that Ms. Washington first required that Mr. Paneque revise his OIC to match his RCP before she invested significant time analyzing the substantiation of his reported financial circumstances.

[*27] Mr. Marsico received formal notification of the reassignment and, for the first time, a new contact person for Mr. Paneque's OIC on September 5, 2006. On September 29, 2006, the OIC was assigned to Ms. Fiske. Thus, the IRS performed no substantive work on Mr. Paneque's OIC from May 26 until September 29, 2006.

Relying on section 301.6404-2(b)(1), Proced. & Admin. Regs., respondent contends that any delay in the processing of Mr. Paneque's OIC during the approximately four months from late May until late September 2006 was attributable to a general administrative decision--namely, the decision to transfer OIC review functions from New Jersey to Tennessee--for which interest may not be abated. We agree.[27]

The decision to transfer the review of OICs from New Jersey to Tennessee was a systemic modification of the manner in which the IRS processed proposed compromises of liabilities. Given the decision's systemic nature, it was a general administrative decision as defined in the regulations, akin to section 301.6404-2(c), Examples (7) and (8), Proced. & Admin. Regs. (decisions concerning how to

---

[27]Petitioners have not challenged the validity of sec. 301.6404-2(b)(1), Proced. & Admin. Regs., insofar as it defines the statutory term "managerial act" to exclude a "general administrative decision". We accordingly apply the regulation as promulgated.

**[*28]** organize and prioritize the processing of returns are general administrative decisions). The reassignment of Mr. Paneque's OIC from Ms. Washington to Ms. Fiske was thus not a managerial decision concerning the assignment of individual IRS employees to specific tasks (as in section 301.6404-2(c), Examples (3), (4), and (5), Proced. & Admin. Regs.) but instead resulted from a general administrative decision. Consequently, the delay in processing Mr. Paneque's OIC from May 26 until September 29, 2006, does not qualify petitioners for an abatement of interest under section 6404(e) and the applicable regulations.[28]

As for the remaining period during which Mr. Paneque's OIC was under consideration--from the assignment to Ms. Fiske on September 29, 2006, until Mr. Marsico's receipt of the formal rejection on March 5, 2007--we perceive no unreasonable delay in the processing of the OIC. Under applicable statutory and administrative procedures, three levels of review of the OIC were required. As an offer specialist, Ms. Fiske lacked authority to reject Mr. Paneque's OIC. She could merely recommend rejection to her group manager, who had such authority.

---

[28]The same holds true for the interest attributable to petitioners' income tax liabilities for their taxable years 1994, 1995, and 1996; that is, years for which abatement was authorized only for delays arising from ministerial (but not managerial) acts. The decision to change the location for processing Mr. Paneque's OIC was obviously not a ministerial act under the applicable regulations.

**[\*29]** See Delegation Order No. 11 (Rev. 24). She did so less than a week after being assigned the OIC. Her group manager formally concurred approximately 60 days later, on December 7, 2006. Further, section 7122(e) requires an independent administrative review of any rejection of an OIC before the rejection is communicated to the taxpayer. Mr. Paneque's OIC was subject to independent administrative review from December 7, 2006, until February 12, 2007, when the reviewer concurred in the rejection determination.[29] Petitioners received formal notification of the rejection on March 5, 2007.

At most, petitioners' complaint with respect to the foregoing period is that Ms. Fiske advised them that they would receive a rejection letter by October 6, 2006. On the basis of the administrative record as a whole, we are satisfied that Ms. Fiske instead explained to Mr. Marsico that she would process her recommendation to reject by that time, which she did. The remaining processing time reflected procedures for statutorily mandated levels of review. We perceive no unreasonable delay; much less that any failure to abate interest for this period

---

[29]Petitioners complain that Mr. Paneque repeatedly sought, to no avail, to have his OIC rejected so that he could appeal the rejection, suggesting that respondent's failure to promptly issue a rejection letter to expedite the appeal contributed to delay. Petitioners have cited no authority for the proposition that a taxpayer may bypass pre-Appeals consideration of an OIC in this manner, and we are aware of none.

**[\*30]** "'would be widely perceived as grossly unfair.'" <u>Krugman v. Commissioner</u>, 112 T.C. at 238-239 (quoting H.R. Rept. No. 94-426, <u>supra</u> at 844; S. Rept. No. 99-313, <u>supra</u> at 208).[30]

C. <u>Petitioners' Third Contention</u>

Petitioners' final contention is that, despite numerous requests over several months, respondent failed to provide Mr. Paneque with a payoff letter in a timely fashion, which led to an unnecessary accrual of additional interest on petitioners' unpaid tax liabilities.

We have held that the Commissioner's providing an incorrect payoff figure is a ministerial act that may give rise to an abatement of interest under section 6404(e). <u>Douponce v. Commissioner</u>, T.C. Memo. 1999-398. We accordingly assume for purposes of deciding these cases that a <u>failure</u> by the Commissioner to provide payoff information when properly requested may constitute a ministerial act for purposes of section 6404(e). As discussed below, however, we conclude

---

[30]Although it is not controlling in this case, we note that sec. 7122(f), added to the Internal Revenue Code as part of the Tax Increase Prevention and Reconciliation Act of 2005 (TIPRA), Pub. L. No. 109-222, sec. 509(b)(2), 120 Stat. at 363, provides that an OIC shall be deemed to be accepted by the Secretary if such offer is not rejected by the Secretary before the date which is 24 months after the date of submission of such offer. Sec. 7122(f) is effective for OICs submitted on or after July 16, 2006. TIPRA, sec. 509(d), 120 Stat. at 364. Mr. Paneque's OIC was rejected just over 17 months after the date it was submitted.

**[\*31]** that petitioners have not established that there was any failure by respondent to provide a payoff figure that resulted in a delayed payment of tax that would otherwise have been paid sooner. See Wright v. Commissioner, T.C. Memo. 2004-69, aff'd, 125 Fed. Appx. 547 (5th Cir. 2005); Harbaugh v. Commissioner, T.C. Memo. 2003-316.

The only evidence petitioners cite in support of their claim that respondent failed to respond to repeated requests for a payoff letter over several months is Mr. Paneque's vague and self-serving testimony to that effect.[31] The record in these cases is sketchy. We have reconstructed events to the extent possible from the case activity records of various IRS personnel, the case notes of Mr. Marsico, and often vague trial testimony. Our careful review of the foregoing persuades us that the circumstances surrounding Mr. Paneque's various requests for payoff information are more complicated than petitioners claim in this proceeding, and they do not establish that there was any unreasonable delay in providing payoff information that prevented them from paying tax liabilities any sooner than would otherwise have been the case.

---

[31]Petitioners in addition point to the fact that RO Matthews recorded Mr. Paneque's complaint to that effect in her case activity records. We conclude that Mr. Paneque's claims made to RO Matthews are unreliable. See supra note 18.

[*32] The first request for a payoff letter established in the record was Mr. Marsico's oral request to Ms. Washington on June 13, 2006. Mr. Marsico's own case notes record that he received a payoff letter on June 15, 2006. Petitioners did not pay any portion of their outstanding tax liabilities at or around this time.

The second request for a payoff letter established in the record occurred on June 27, 2006, when Mr. Marsico telephoned Ms. Washington and left a message requesting a payoff letter through July 7, 2006. He left a second message to similar effect on July 11, 2006. Although Ms. Washington returned neither call, the calls were made after Ms. Washington had advised Mr. Marsico (twice) that she was no longer assigned to Mr. Paneque's OIC. Thus, to the extent any delay was caused by Ms. Washington's failure to respond in June and July of 2006, it is attributable to the general administrative decision to transfer OIC review functions from New Jersey to Tennessee. We also note that Mr. Marsico had other avenues for requesting payoff information. See IRS Publ'n 1468. Moreover, Mr. Paneque advised Mr. Marsico on July 11, 2006, that he was unable to pay his outstanding liabilities in full at that time. See Wright v. Commissioner, T.C. Memo. 2004-69. Accordingly, any purported failure of respondent to provide payoff information on or about July 11, 2006, did not cause any delay in petitioners' payment of their outstanding tax liabilities and/or was not eligible for interest abatement.

[*33] The third request for a payoff letter established in the record arose on January 4, 2007, when Mr. Marsico called Ms. Fiske's office to request one but was advised that she would be out of the office until January 23, 2007. Instead of exploring other sources for payoff information within the IRS at that time, Mr. Marsico on January 6 filed a request for Taxpayer Advocate assistance, complaining of the failure to receive a rejection letter with respect to Mr. Paneque's OIC (and not the failure to receive payoff information). When Ms. Fiske returned on January 23, Mr. Marsico requested payoff information. Ms. Fiske advised that she had requested transcripts with payoff information. The transcripts were apparently received the next day, because her case activity notes record that she and Mr. Marsico discussed the transcripts by phone on January 24; that Mr. Marsico identified a lender that required a payoff letter before making a loan to Mr. Paneque; and that she advised Mr. Marsico of an IRS telephone number to use for purposes of third-party requests for payoff information. The record is silent with respect to what efforts Mr. Marsico made to use this contact information. Considered as a whole, we conclude that this January 2007 sequence does not establish a failure by respondent to provide payoff information.

The fourth request for a payoff letter established in the record occurred on February 16, 2007, when Mr. Paneque sought unsuccessfully to obtain a payoff

[*34] letter from an IRS field office. On February 19, Mr. Marsico sought Ms. Fiske's assistance. Ms. Fiske apparently responded, because Mr. Marsico's case notes record that he and Mr. Paneque met on February 26 to discuss an IRS fax that contained payoff information. Mr. Marsico's notes further reveal that Mr. Paneque was to determine whether his lender would accept this information, but the record is silent with respect to any further developments. We conclude that the February 2007 events do not establish a failure by the IRS to provide payoff information.

Finally, the record establishes that on two occasions--May 15, 2007, and July 17, 2007--Mr. Paneque requested payoff amounts from RO Matthews for the employment tax liabilities arising from the operations of JBDG Accounting. The disposition of the first request is unclear from the record, while the second request was promptly satisfied at least orally. In any event, petitioners have not established that there was any failure to satisfy an employment tax payoff letter request that caused a delay in their payment of income tax.

In short, the record reflects that Mr. Paneque or his counsel made several requests for payoff letters or information during 2006 and 2007. But it is not the case, as petitioners contend, that respondent never provided payoff information over this period despite repeated requests. Respondent complied outright in one

**[\*35]** instance and cooperated in important respects in others, and in others the record is too sketchy to support a finding that respondent failed to timely satisfy a request for a payoff letter or its substantial equivalent.  As it is petitioners' burden to establish a delay in the performance of a ministerial act that resulted in their making a payment of tax later than they otherwise would have, we conclude that respondent did not abuse his discretion in failing to abate any interest attributable to petitioners' claim concerning payoff letters.

To reflect the foregoing,

<u>Decisions will be entered for</u>

<u>respondent</u>.